UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
GUSRAE KAPLAN NUSBAUM PLLC AND         CASE NO. _____
RYAN J. WHALEN

       Plaintiffs,

       -against-

APPLIED ENERGETICS, INC., GREGORY        **COMPLAINT**
J. QUARLES, BRADFORD ADAMCZYK,
JONATHAN BARCKLOW, JOHN SCHULTZ,
DAN W. BAER, MASUR GRIFFITTS + LLP,
MARY O'HARA, ENTERPRISE COUNSEL       **Jury Trial Demanded**
GROUP and BEN PUGH

       Defendants.
------------------------------------------------------------------X

Plaintiffs Gusrae Kaplan Nusbaum PLLC ("GKN") and Ryan J. Whalen ("Whalen") (collectively, "Plaintiffs"), allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.

1.    This is an action for securities fraud pursuant to Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §§78j(b)), and Rule 10b-5, 17 C.F.R. §240.10b-5 ("Exchange Act") and tortious interference with economic relations and libel per se, arising out of bad-faith efforts by defendants to prevent Plaintiffs from selling 1,242,711  shares (the "Shares") of Applied Energetics, Inc. ("AE") common stock issued for legal services rendered.

2.    Plaintiffs, collectively, own 1,242,711 shares of AE common stock.

3.    Defendants' wrongful actions are intended to manipulate the market price of AE common stock for the benefit of certain shareholders of AE, including members of AE's board of directors and a consultant to the board of directors.

4.     On May 31, 2019, AE, on behalf of certain shareholders, including, directors and consultants, filed with the Securities and Exchange Commission a Form S-1 (the "S-1") to register for sale in the public markets approximately 48 million shares of AE common stock.

5.     On June 24, 2019, the S-1 became effective, allowing various insiders, including certain defendants, to sell their shares in the public market.

6.     From May 7, 2019 until June 24, 2019 (*i.e.,* the day the S-1 became effective), AE common stock had suffered a decline of approximately 43%.

7.     This sharp drop in share price was the result of various corporate filings disclosing AE to be in dire financial condition, and a recently published article on Seeking Alpha, a widely read financial markets website, describing AE as "Set To Implode."

8.     Due to the pending S-1 becoming effective, which would result in approximately 48 million shares of AE becoming available for public sale, and the litany of grim news, AE, its directors, consultants and counsel, were desperate to prevent any further drop in AE stock price.

9.     In an effort to prevent additional selling pressure on AE stock, on June 26, 2019, Defendants published a letter to Plaintiffs, its stockbroker and AE's transfer agent that asserted per se libelous statements about Plaintiffs and demanding that Plaintiffs return all 1,242,711 shares to AE (the "Demand Letter").[1]

10.     As a result of reading the per se libelous statements in the Demand Letter, Plaintiffs' stockbroker is refusing to sell Plaintiffs' Shares.

11.     Defendants' wrongful and malicious efforts to prevent Plaintiffs from selling some or all of their shares have artificially manipulated and are attempting to artificially the value of its common stock in the public markets.

---

[1] A copy of the Demand Letter is submitted herewith as Exhibit ("Ex.") 1.

12.     Defendants' wrongful actions have prevented Plaintiffs from selling shares of AE prior to AE stock declining in price by approximately 40%.

13.     Defendants' wrongful conduct has proceeded in bad faith thereby necessitating this action to recover the loss of value of Shares in addition to other damages.

14.     Plaintiffs also seek a declaratory judgment from this Court that they are the rightful owners of the Shares.

## PARTIES

15.     Plaintiff GKN is a law firm with its principal place of business in New York County.

16.     Plaintiff Whalen is a resident of New York County and a member of GKN.

17.     Defendant Applied Energetics, Inc. ("AE") is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business at 2480 W. Ruthrauff Road, Suite 140Q, Tucson, Arizona 85705.

18.     Defendant Gregory J. Quarles ("Quarles") is a director, president and chief executive officer of AE, and is a resident of Washington State.

19.     Defendant Bradford Adamczyk ("Adamczyk") is the chairman of AE's board of directors and with a principal business address of 16A Harston, 109 Repulse Bay Road, Repulse Bay, 00000, Hong Kong.

20.     Defendant Jonathan Barcklow ("Barcklow") is a director of AE with a principal business address of 6412 Brandon Avenue, #335, Springfield, Virginia, 22150.

21.     Defendant John Schultz ("Schultz") is a director of AE with a principal business address of 300 E. Bonita Avenue, #4092, San Dimas, California 91773.

22.     Defendant Dan W. Baer is a consultant to AE's board of directors and, upon

3

information and belief, is a control person of AE with a business address of 4676 Lakeview Avenue, Yorba Linda, CA 92886.

23.      Defendant Masur Griffitts + LLP ("Masur") is a law firm with a principal place of business of 65 Reade Street, New York, NY 10007.

24.      Defendant Mary O'Hara ("O'Hara") is a partner at Masur and AE's outside corporate/securities counsel with a principal place of business of 65 Reade Street, New York, NY 10007.

25.      Defendant Enterprise Counsel Group ("ECG") a law corporation with a principal place of business of Three Park Plaza, Suite 1400, Irvine, California 92614.

26.      Defendant Ben Pugh is a partner at ECG with a principal place of business of Three Park Plaza, Suite 1400, Irvine, California 92614.

27.      Quarles, Adamczyk, Barcklow, Schultz and Baer direct and control all business operations and decisions of AE.

## JURISDICTION AND VENUE

28.      The Court has personal jurisdiction over each of the Defendants because certain of the acts, transactions and course of business alleged herein occurred in the Southern District of New York and caused injury to Plaintiffs who are located in this District.

29.      Plaintiffs' claims arise under Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b)) and Rule 10b-5 promulgated thereunder (17.C.F.R. § 240.10b-5).  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and Section 27 of the Exchange Act (15 U.S.C. §§ 78aa).

30.      This Court also has supplemental jurisdiction over Plaintiffs' state and common law claims pursuant to 28 U.S.C. § 1367, as the claims against Defendants are related to the claims

upon which subject matter jurisdiction is based.

31.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), and Section 27(c) of the Exchange Act (15 U.S.C. § 78aa), because a substantial part of the events, actions or omissions giving rise to the dispute occurred in this District, including the dissemination of materially false and misleading statements that were reported, prepared by or with the participation, acquiescence, encouragement, cooperation, or assistance of Defendants.  In addition, GKN performed the services that entitles Plaintiffs to the shares in question in this District.

32.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including, the United States mail, interstate telephonic communications and/or the facilities of the national securities markets.

## NATURE OF THE ACTION

33.     Defendant AE is a publicly reporting company that purports to be in the business of applied energy systems (*i.e.,* lasers) for military and commercial purposes.

34.     GKN is a law firm located at 120 Wall Street, New York, NY 10005.  Whalen is a member of GKN.

### The Superius Litigation

35.     Beginning in or about September 2016, GKN provided legal counsel to George Farley, who was then sole director and chief executive officer of AE, in response to allegations raised by certain AE shareholders that Farley engaged in "self-dealing" when AE authorized the issuance to Farley of 25 million shares of restricted stock.

36.     On January 13, 2017, certain AE shareholders filed a derivative lawsuit in Delaware Chancery Court entitled *Superius Securities Group, Inc. Profit Sharing Plan et. al. v. George*

*Farley and Applied Energetics (as a nominal defendant)*, C.A. No. 2017-0024-TMR (the "Superius Litigation").

37.     The plaintiffs in the Superius Litigation alleged that Farley breached his fiduciary duties as AE's director by, *inter alia*, issuing himself 25 million restricted shares of AE stock at below fair market value on or about February 15, 2016.

38.     On or about February 2, 2017, GKN and Farley entered into an engagement agreement whereby GKN agreed to represent Farley in the Superius Litigation.

39.     In connection with the Superius Litigation, GKN expended substantial time and effort familiarizing itself with the facts surrounding plaintiffs' allegations against Farley.  GKN reviewed a significant amount of documentation, including Farley's emails and AE's corporate filings with the Securities and Exchange Commission (dating back to 2012).  GKN also spent a significant amount of time researching the legal issues presented in the Superius Litigation and developing legal strategies to defend the claims asserted by plaintiffs in the case.

40.     On March 3, 2017, Farley filed a motion to dismiss the plaintiffs' complaint in the Superius Litigation (i) for failure to properly plead that demand was excused pursuant to the requirements of Delaware Court of Chancery Rule 23.1; and (ii) for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6).

41.     Rather than file an answering brief, plaintiffs in the Superius Litigation filed an amended complaint against Farley on May 4, 2017.

42.     On July 7, 2017, Farley filed a motion to dismiss the plaintiffs' amended complaint. After filing, plaintiffs in the Superius Litigation voluntarily dismissed all of their claims.

43.     On or about August 4, 2017, the Delaware Chancery Court entered an Order dismissing the Superius Litigation.

44.     AE informed GKN that, pursuant to 8 Del.C. 145(c) and its by-laws, it would indemnify George for the unpaid legal fees due GKN for services rendered in the Superius Litigation totaling $33,324.

45.     In August 2017, however, AE informed GKN that it did not have the funds to pay GKN for the unpaid legal fees.

## The Proxy Solicitation

46.     On or about January 18, 2018, certain AE shareholders, including Thomas C. Dearmin ("Dearmin"), Adamcyzk, Barcklow, Schultz and Oak Tree Asset Management Ltd. ("Oak Tree") (collectively, the "Dissidents") filed a Schedule 14A preliminary consent solicitation statement (the "Preliminary Consent Statement") with the Securities and Exchange Commission ("SEC") that proposed to remove Farley as the sole member of AE's Board of Directors and elect Dearmin, among other nominees, as directors of the company.

47.     The allegations raised by the Dissidents in the Preliminary Consent Statement seeking Farley's removal from AE were essentially identical to the allegations raised by plaintiffs in the Superius Litigation.  In fact, the Preliminary Consent Statement expressly referenced the allegations in the Superius Litigation as the basis for Farley's removal as director.

48.     AE requested GKN to provide legal counsel in connection to the proxy solicitation.

49.     GKN responded that before agreeing to act as counsel for AE in connection with the proxy solicitation, AE would need to finally arrange for the payment of the unpaid legal fees due GKN from the Superius Litigation.

50.     AE again informed GKN that it had no cash to pay the $33,324 due GKN,[2] and

---

[2] AE's 2017 Form 10-K for the year ending 2017 reported that as of December 31, 2017, AE had "cash and cash equivalents" of $2,764.

asked GKN if it would accept AE's restricted stock for payment of the unpaid invoice and for services rendered in connection with the proxy solicitation.

51.     GKN was not obligated to accept restricted common stock as payment for services rendered, and was concerned about doing so for several reasons, including: (i) AE has never been a profitable company; (ii) had not sold a single product for several years; (iii) had no products available for sale; (iv) had no cash to adequately fund its reactivation plans, and (v) had no employees.  AE also was not listed on a public exchange, but instead merely thinly-traded on the OTC exchange.

52.     Thus, Plaintiffs believed there was a substantial risk that by the time their restricted shares could be sold (*i.e.,* over a year later), AE would be bankrupt or defunct and Plaintiffs' Shares worthless.

53.     Nevertheless, GKN (reluctantly) agreed that upon receipt of the restricted shares, it would discharge the amount due for services rendered in the Superius Litigation.

54.     Upon request of AE, on January 22, 2018, Whalen emailed Farley and AE's securities and corporate counsel, defendant O'Hara, citations to legal authority establishing George's right to indemnification from AE for said legal fees, and attached GKN's December 2017 invoice in the amount of $33,324 for services rendered in the Superius Litigation.

55.     Neither O'Hara (as counsel for AE) nor AE itself raised any concern with the fees that constituted the $33,324 invoice.

56.     On January 23, 2018, AE's publicly-traded common stock closed at $0.062 per share with a volume of 72,333 shares sold.

57.     On January 23, 2018, Farley, as director and CEO of AE, instructed O'Hara and AE's financial manager Stephen McCommon to proceed with issuing 1,074,968 restricted shares

to GKN for payment of $33,324 of services rendered in the Superius Litigation:

> [GKN] … has agreed to accept restricted stock in lieu of cash in satisfaction thereof. We will use the shares based on a 50% discount from the market which is the discount given to John Schultz and his clients. Please prepare a LOI for Continental [the Transfer Agent] to issue 1,074,968 shares. Mary [O'Hara] will issue the necessary opinion to Continental.

58.     From January 19, 2018 through January 23, 2018, GKN billed 10.2 hours to AE in connection with the proxy solicitation. The fees totaled $5,200.

59.     AE again requested if the current fees due GKN for the proxy solicitation could be paid with AE common stock. Again, GKN reluctantly agreed.

60.     On January 23, 2018, GKN provided an invoice for services rendered of $5,200 through January 23, 2018 in connection with the proxy solicitation, which was payable in 167,742 shares of AE restricted common stock.

61.     While invoices for services rendered are not generally issued by GKN mid-month, AE requested the January 23rd invoice in order to limit O'Hara's attorneys' fees so that she would only have to prepare one opinion letter for all of the shares to be issued to Plaintiffs rather than two separate opinion letters.

62.      The issuance of 167,742 of restricted shares to Plaintiffs for the $5,200 of services rendered to AE, along with the 1,074,968 shares of AE restricted stock payable to Plaintiffs for services rendered Farley in the Superius Litigation, was addressed in one opinion letter from O'Hara, rather than two separate opinion letters.

63.     On January, 24, 2018, AE revised its letter to Transfer Agent and instructed the transfer agent to issue 1,242,710 shares of AE restricted common stock to GKN and Whalen:

> In connection with the issuance of 1,242,710 shares ("Shares") of Applied Energetics, Inc. (the "Company") common stock to those set forth on Schedule 1 attached [providing that GKN was to receive 745,626 shares and Whalen was to receive 497,084], you are hereby instructed to issue the shares in certificate form

with the following restrictive legend …. If you have any questions regarding this letter, please feel free to contact the undersigned or Mary Payton O'Hara at Masur Griffits ….

64.     On or about February 5, 2018, O'Hara emailed Whalen to inform him that she was completing her opinion for the 1,242,710 restricted shares to be issued to GKN and Whalen.

65.     O'Hara requested a copy of the invoices for services rendered to Farley in the Superius Litigation and AE in connection with the proxy solicitation.

66.     O'Hara acknowledged—without objection or issue—that the restricted shares issued to Plaintiffs would be valued at a 50% discount to the freely traded shares.

67.     On February 5, 2018, Whalen emailed O'Hara the requested invoices, and in response, O'Hara emailed Whalen, "Very good.  Thank you."

68.     At no time until June 26, 2019 did O'Hara raise any concerns with AE issuing the restricted shares to GKN for services rendered to Farley in the Superius litigation or AE in connection with the proxy solicitation.

69.     In fact, O'Hara was fully aware of the work performed by GKN from January 19, 2018 through January 23, 2018 in connection with the proxy solicitation, because she worked alongside GKN in providing counsel to AE.

70.     On February 5, 2018, O'Hara, in her capacity as AE's corporate and securities counsel, sent an opinion letter to AE's stock transfer agent authorizing AE's issuance of 1,242,711 restricted shares of common stock to GKN and Whalen in exchange for legal services valued at $38,524.26.

71.     This amount included the value of legal services rendered by GKN in defending Farley in the Superius Litigation ($33,324.26) and also the value of legal services rendered in connection with the proxy solicitation ($5,200).

72.     From January 24, 2018 through early March 2018, GKN continued to provide AE legal services in connection with the proxy solicitation and the Dissidents' demand for AE's shareholder list.  AE never compensated GKN for those services.

73.     On or before March 8, 2018, the Transfer Agent issued AE stock certificates to GKN and Whalen.

74.     Ultimately, AE did not fight the proxy with a counter-solicitation, nor did AE challenge the shareholder vote.

75.     This was not an acquiescence of the allegations made in the proxy solicitation.

76.     Rather, AE's decision not to the fight the Dissidents' proxy solicitation was based on the concern that AE did not have the funds to engage in a proxy fight, where the only certainty would be burdening AE with substantial attorneys' and proxy solicitor's fees and proxy solicitor and related costs that would have likely forced it into bankruptcy to the detriment of its shareholders.

77.     On March 8, 2018, the Dissidents received the written consents of AE's shareholders to remove Farley as its CEO and director (a position Farley had held since 2004). Simultaneously, Dearmin, Barcklow and Adamzyck were elected as directors of AE (collectively, "New Management").  Dearmin was also appointed as AE's chief executive officer.

78.     On March 11, 2018, Whalen received an email from Dearmin (in which AE's other directors were included) terminating GKN's services.

79.     Dearmin passed away on or about August 3, 2018.

**The AE v. Farley Litigation**

80.     On or about July 3, 2018, AE commenced a litigation against Farley and AnneMarieCo LLC ("AMC") in the Delaware Chancery Court C.A. No. 2018-0489 TMR (the

"AE Litigation").

81.     The AE Litigation asserted essentially the same claims of breach of fiduciary duty that were asserted against Farley in the Superius Litigation.

82.     Simultaneously with the filing of the complaint, AE also filed a motion for a temporary restraining order and preliminary injunction against Farley and AMC to prevent them from selling or transferring any shares of AE (the "TRO Motion").

83.     On July 3, 2018, AE's counsel in the AE Litigation voluntarily and without solicitation emailed copies of the complaint and TRO Motion to Whalen and asked that as "counsel" for Farley and AMC if he would participate in a telephonic conference to discuss the complaint and TRO Motion.  Whalen agreed to accept service of the complaint and TRO Motion and participate on the conference call.

84.     But on or about August 8, 2018, AE filed a motion to disqualify GKN and Whalen as counsel for Farley and AMC in the AE Litigation on the basis that GKN's representation of Farley in the Superius Litigation and AE in connection with the proxy solicitation created a conflict of interest.

85.     After AE requested its client file from GKN, GKN provided AE with GKN's client file for AE on September 10, 2018.

86.     By Order dated October 23, 2018, the Chancery Court denied AE's motion to disqualify GKN and Whalen as defendants' counsel in the AE Litigation on the basis that AE's counsel reached out to GKN on July 3, 2018 to request if GKN/Whalen, as counsel for Farley, would accept service of the complaint and TRO Motion and participate in the AE Litigation on Farley's behalf, despite AE having knowledge that GKN/Whalen represented Farley in the Superius Litigation and AE in connection with the proxy solicitation.

87.     By Order dated January 24, 2019, the Chancery Court granted AE's motion for a preliminary injunction staying the sale or transfer of Farley and AMC's shares of AE stock.  The action is still pending and has a trial date of January 21, 2020.

**AE Represented That Plaintiffs' Received "Authorized Capital Stock"**

88.     Over the last fifteen months, AE's new management caused AE to make several public filings with the Securities and Exchange Commission (the "SEC") in which AE represented that the shares issued to GKN were validly-issued for services rendered.

89.     Plaintiffs relied on these representations.

90.     For example, in AE's Form 10-K for the year ending 2017 (filed on April 17, 2018), AE wrote "[o]n January 24, 2018, we issued 1,242,710 shares of common stock in settlement of invoices valued at $38,524.26 with a vendor [GKN]."[3]

91.     Moreover, all of AE's financial information included the Shares in its calculation of capital stock.

92.     On May 31, 2019, the S-1 was filed seeking register the sale of 48,725,534 shares of common stock on behalf of individuals and entities, including, certain directors and consultants, which purchased and/or received common stock from AE from April 2018 through January 2019.

93.     Again, AE raised no issues with the Shares and its calculations of capital stock included the Shares.

94.     Under Note 5 of the S-1, under the heading "**Authorized Capital Stock**," AE again represented that Plaintiffs' Shares were validly issued, stating that "[o]n January 24, 2018, [AE]

---

[3] *See also* (i) AE's Form 10-Q for quarterly period ended March 31, 2018, filed on May 15, 2018; (ii) Form 10-Q for quarterly period ended June 30, 2018, filed on August 13, 2018; (iii) Form 10-Q for quarterly period ended September 30, 2018, filed on November 9, 2018; (iv) Form 10-K for year ended 2018, filed on April 1, 2019; and (v) Form 10-Q for quarterly period ended March 31, 2019, filed May 15, 2019.

issued 1,242,710 shares of common stock in settlement of invoices valued at $38,524.26 with a vendor."

95.    Under Rule 144 promulgated under the Securities Act of 1933 (the "Securities Act") ("Rule 144"), non-affiliates of an issuer that was previously a shell company must hold restricted shares for 12 months and are subject to certain procedural requirements, and thereafter, the restrictive legend setting forth the nature of the restriction can be removed and the shares legally sold into the public market.

96.    AE was a shell company until in or about April 2017.

97.    The restricted legend on Plaintiffs' Shares certificates provides:

> THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THE SECURITES UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SICH REGISTRATION IS NOT REQUIRED OR UNLESS SOLD PURSUANT TO RULE 144 OF SUCH ACT.

98.    On March 25, 2019, Sharon Mitchell of SD Mitchell Associates, PLC ("Mitchell"), counsel for GKN and Whalen, provided the Transfer Agent (Continental) with an opinion letter that the 745,626 shares issued to GKN and the 497,084 shares issued to Whalen may be re-issued without restrictive legends pursuant to Rule 144, as they have held their shares for over one year and neither are currently or have been for the past ninety days an affiliate of AE (the "March 25th Opinion Letter").

99.    On April 3, 2019, Michael Mullings, chief compliance officer for the Transfer Agent, responded to Mitchell's March 25th Opinion Letter, stating that the restrictive legends could only be removed upon the sale of the shares, and since the all or some of the shares had not yet

been sold, Transfer Agent would not remove the restrictive legends.

100.    On April 12, 2019, O'Hara, on behalf of AE, also responded to the March 25th Opinion Letter and merely reiterated the Transfer Agent's opinion that the restrictive legends on Plaintiffs' shares "may only be removed upon sale of shares."

101.    O'Hara did not assert that the Shares issued to Plaintiffs were unauthorized, rescindable or otherwise voidable.

102.    As such, again, Plaintiffs relied on this representation by AE, through its counsel, that the Shares were validly-issued to Plaintiffs and that AE had no objection to sale of the Shares.

103.    In May 2019, Plaintiffs opened separate brokerage accounts at Glendale Securities, Inc. ("Broker") for the purpose of selling the Shares in whole or part.

104.    On or about May 28, 2018, Transfer Agent was contacted by Wilson Davis & Co., Inc, ("Wilson-Davis" or "Clearing Firm"), which is the clearing firm for the Broker, requesting the certificate for Whalen's shares be re-issued without a restrictive legend.

105.    On June 12, 2019, Mullings of Transfer Agent emailed Broker, Mitchell (counsel for Plaintiffs) and O'Hara (counsel for AE) requesting that Mitchell re-issue her March 25th Opinion Letter to confirm that AE is up to date on its SEC filings, as required by Rule 144.

106.    Mullings also reiterated that for the shares to be cleared for sale, the Transfer Agent "requires a representation from the broker certifying that the shares have been sold since the issuer is restrained by Rule 144(i)(2)."

107.    In the same email, Mullings wrote to O'Hara:

We need your or the issuer's authorization to proceed with the transaction if the documentation discussed above is provided.  We are attaching a demand letter from shareholder's counsel asserting their Article 8 rights.  As you know, under Article 8 and relevant case law, it is not sufficient for the issue to simply refuse to render an opinion in such circumstances where an item is presented in proper transfer order with an opinion of presenter's counsel.

108.    On June 12, 2019, Mitchell updated the March 25th Opinion Letter confirming with Transfer Agent that AE is up-to-date with its SEC filings.

109.    On June 17, 2019, Broker, on behalf of Whalen, sold 100,000 of the 497,084 shares held by Whalen at an average price of approximately $0.32 per share.

110.    Broker then informed the Transfer Agent that 100,000 shares have been sold and requested that it release a certificate for the 100,000 shares without a restrictive legend.

111.    Broker was informed by the Transfer Agent that it could not release the certificate for the 100,000 shares because O'Hara and AE had not responded to his requests for authorization to proceed with the release of the 100,000 shares without a restrictive legend.

112.    On June 18, 2019, Whalen telephoned O'Hara to inquire why she or AE had not yet responded to Transfer Agent's inquiry.

113.    O'Hara stated that she was waiting for AE to inform her how to respond.

114.    On June 19, 2019, Whalen telephoned the Transfer Agent to inquire if Mullings had yet received authorization from O'Hara or AE to proceed with the release of the share certificate.

115.    Mullings told Whalen that he had not yet received confirmation from O'Hara or AE for the release of the share certificate, and if no opinion was provided by O'Hara or AE by the end of the day, the Transfer Agent would release the 100,000 shares without a restrictive legend.

116.    On June 20, 2019, Mullings emailed Whalen that he "spoke to issuer's counsel [O'Hara] late this afternoon and they could provide no legal basis or produce a TRO to stop us from processing the transfer. As such the transfer was done. The certificates will be available for mailing tomorrow as it was past cutoff for us."

117.    As a result of O'Hara and AE's intentional refusal to timely respond to the Transfer

16

Agent's request for an opinion, the June 17, 2019 sale of 100,000 shares of AE stock did not clear until June 25th.

118.    From June 18th through June 25th, Whalen was unable to execute another sale of AE stock during this time period because the sale of the 100,000 shares had not yet cleared.

### AE Is In Dire Financial Condition

119.    AE is in dire financial condition:

For the three months ended March 31, 2019, the company incurred a net loss of approximately $586,000, had negative cash flows from operations of approximately $648,000, conducted financing activities yielding $400,000 in proceeds from notes payable and $150,000 in proceeds from issuance of common stock and expects to incur additional future losses due to the reactivation of its business activities. These matters raise substantial doubt as to the company's ability to continue as a going concern unless the company is able to obtain additional financing for its continuing operations.

AE's Form 10-Q for the quarterly period ending March 31, 2019 (May 15, 2019).

120.    The same Form 10-Q reports that as of March 31, 2019, AE had cash and cash equivalents of $80,828 with total liabilities of $1,699,592, which includes, but is not limited to, accounts payable of $552,530, accrued compensation of $422,333 and notes payable of $403,918. AE's operating expenses for the first three months of 2019 were $581,715.

121.    AE's S-1 filed on May 31, 2019, reported on page 5 that:

For each of the Company's fiscal years ended December 31, 2018 and 2017, we had no revenues, and we had net losses of $3,007,747 and $790,046 for fiscal years 2018 and 2017, respectively. We can give no assurances that our planned operations will generate revenues in the future or whether any such revenues will result in profitability.

122.    AE further reported that "[f]or the year ended December 31, 2018, the company incurred a net loss of approximately $3,008,000, had negative cash flows from operations of $1,792,000 and may incur additional future losses due to the reduction in government contract activity. These matters raise substantial doubt as to the company's ability to continue as a going

concern." <u>Id.</u> at 23.

123.     On June 18, 2019, Seeking Alpha, a widely-read financial markets website, published an article arguing that AE would soon "implode," noting that:[4]

- There have been no significant achievements since executives laid out a plan to revive the company in 2017.

- The share count has more than doubled since 2017, and the stock price has risen over 400% since the beginning of the year.

- A whopping 48.7 million shares that were bought for $0.06 or less are now getting registered for sale.

- On 5/24/19, the company issued 2.5 million warrants at a $0.06 exercise price, which we believe indicates what the stock is worth.

- Applied Energetics … is effectively a shell company with no real business. It has no revenues, almost no cash, no customers, no products, no employees (except a couple executives and consultants), and a headquarters located at a strip mall. But it has recently rallied to an over $65M market cap at $0.33 per share from hype that it will start re-selling its old, failed defense technology, lasers, to the US military. The US military had already stopped doing business with AERG in 2013, as its products were a disaster. We find no logical reason why the military will do business with AERG again. And that's even if they manage to create a competitive product, which in itself is very unlikely in our opinion.

Seeking Alpha, "Applied Energetics: Resurrected Failed Weapons Technology Company Set To Implode" (June 18, 2019), https://seekingalpha.com/article/4270848-applied-energetics-resurrected-failed-weapons-technology-company-set-implode.

124.     On June 18, 2019, AE stock opened at $0.36.

125.     On June 19, 2019, the day after the article was published, investors sold 566,560 shares of AE—approximately triple its average trading volume.

---

[4] *See*

126.    Consequently, on June 19, 2012, AE's stock closed at $.2535.

127.    The public reporting of AE's operational and financial issues caused its stock to plummet.

128.    Plaintiffs' sale of their own AE shares would only cause the stock to fall even farther.

129.    AE knew that Plaintiffs intended to sell their Shares on the public markets and sought to prevent any further drop in price that could result from Plaintiffs' sale of their Shares.

130.    Between opening on June 18, 2019 and closing on June 25, 2019, AE's share price dropped almost 30%, from $0.36 to $0.26.

### Defendants' Artifice To Manipulate The Price Of AE's Stock

131.    AE's actions delayed Plaintiffs' sale of the Shares in order to manipulate the market price of AE stock to the detriment of Plaintiffs and/or benefit of the selling shareholders listed in the S-1, which included several insiders, including, Barcklow and Adamczyk and Baer and E. Lee Pinney ("Pinney")[5], who collectively registered over registered 9,833,333 shares of stock to be offered for sale under the S-1.

132.    Defendants caused AE to intentionally delay its response to the Transfer Agent's request in order to limit the shares of AE that Plaintiffs could sell before the SEC designated AE's S-1 effective. .

133.    Defendants did not want Plaintiffs to be able to sell AE stock prior to the S-1 becoming effective because they did not want Plaintiffs' sales of AE stock to further drop before the S-1's shareholders were able to sell their own shares.

---

[5] Pinney is a non-party.  Pinney is also a consultant to AE's board of directors.  Upon information and belief, WCC Ventures, LLC is an entity controlled by Pinney, and also provides consulting services to AE's board of directors.  *See* AE's Form 8-K dated February 22, 2019.

134.    On June 24, 2019, the S-1 became effective.

135.    On June 24, 2019, counsel for AE, ECG/Pugh emailed Plaintiffs the Demand Letter demanding that Plaintiffs return all of their Shares.

136.    At no time during the previous 15 months had AE's new management or its counsel ever made a demand for the return of Plaintiffs' Shares.

137.    In fact, for the past 15 months, AE's new management repeatedly represented to AE's shareholders, including Plaintiffs, that the Shares were authorized and validly-issued for legal services rendered.

138.    For the last fifteen months, Plaintiffs relied on AE's repeated public representations that they owned the shares.

139.    The Demand Letter asserts several statements of fact that are false and libelous, including the lies that:

-    GKN participated in an "obvious conspiracy" with Farley.  Ex. 1, p. 3.

-    "Gusrae Kaplan Failed To Comply with New York Rule of Professional Conduct 1.8" *Id.*

-    "Gusrae Kaplan Failed To Comply with New York Rule of Professional Conduct 1.7" *Id.,* p. 4.

-    GKN engaged in a "breach of the fiduciary duty of loyalty owed to a client by an attorney." *Id.* p. 7.

140.    AE also asserts that before GKN accepted the Shares, AE was required to have independent counsel represent AE in the transaction and that GKN was obligated to have an independent valuation of the shares issued to GKN. *See id.,* pp. 4-5.

141.    This not an accurate representation of New York law.

142.    This is also a material misrepresentation of fact because Defendants are all aware that Masur/O'Hara acted as AE's independent counsel in connection with the transactions where AE authorized the issuance of 1,242,711 shares to GKN.

143.    In fact, O'Hara wrote the opinion letter to the Transfer Agent on February 5, 2018 approving the issuance of the shares to Plaintiffs.

144.    To this day, O'Hara still represents AE.

145.    AE's Demand Letter establishes either that (i) its repeated representations over the last 15 months in its public filings that Plaintiffs' Shares were validly issued and authorized were intentional material misstatements of fact that were relied upon by Plaintiffs; or (ii) that the Demand Letter asserts intentional material misrepresentations of fact that Plaintiffs' Shares were not validly issued and authorized.

146.    Had AE disclosed that it did not believe the Shares issued to Plaintiffs were validly-issued—which it could have done so as early as March 2018—Plaintiffs would have immediately obtained prompt judicial relief to declare that the Shares were properly-authorized to Plaintiffs and are not rescindable, which would have resulted in Plaintiffs being able to freely sell their shares no later than March 2019.

147.    Rather, Plaintiffs relied on the publicly-filed statements of AE that the Shares issued to Plaintiffs were valid and authorized.

148.    AE's demand for the return of Plaintiffs' shares on June 24, 2019 was also contrary to (i) O'Hara's email to Plaintiff and the Transfer Agent on April 12, 2019 that the restrictive legends on Plaintiffs' Shares could be removed upon a sale of the Shares; and (ii) O'Hara's representation to the Transfer Agent's representation on June 20, 2019 that AE had no legal basis to stop the transfer of the 100,000 shares to clear the trade made on June 17, 2019.

149.    On June 25, 2019, Whalen emailed O'Hara asking her to confirm if Mullings' representation of his conversation with O'Hara on June 20, 2019 was accurate.

150.    On June 26, 2019, O'Hara responded to Whalen, Transfer Agent, and Broker: "…no, I would not characterize it like that… I am attaching a copy of the [Demand Letter], this will clarify the company's position with respect to the shares."

151.    In response to receiving the Demand Letter, the Broker informed Whalen due to allegations in the Demand Letter, Broker would not sell the Shares.

152.    Defendants' misconduct is transparent and malicious.

153.    From March 2018 through May 31, 2019, Defendants caused AE to represent repeatedly and publicly that Plaintiffs' Shares were authorized and validly issued for services rendered.

154.    Only after (i) AE's stock suffered a significant price drop and (ii) certain shareholders, including directors and other insiders of AE are able to sell their stock in the public market, do Defendants assert that the Shares were not authorized and are rescindable in an effort to prevent Plaintiffs from selling the Shares in the open market.

155.    Defendants willfully and intentionally used the meritless Demand Letter in violation of the federal securities laws to artificially manipulate the supply and demand for AE stock by intimidating the Broker out of selling Plaintiffs' Shares in the public markets and to defame Plaintiffs in their profession by alleging they engaged in unethical and wrongful conduct.

156.    Defendants' aforementioned conduct intentionally and willfully (a) manipulated supply and demand for AE shares on the OTC market, and (b) artificially affected AE's stock price.

## COUNT I

### (Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Thereunder against AE)

157.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

158.    By engaging in the acts and conduct described herein, AE, directly or indirectly, singly or in concert, by use of the means or instrumentalities of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase and sale of securities, has: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and/or (c) engaged in acts, practices and a course of business that operated as a fraud and deceit upon Plaintiffs as purchaser of the Shares.

159.    AE committed wrongful conduct by intentionally, willfully and repeatedly disclosing to the public that the shares issued to Plaintiffs were authorized and validly issued when, in fact, AE, as an issuer, had no intention of permitting the Transfer Agent from delivering certificates to Plaintiffs without restrictive legends so that Plaintiffs could sell their Shares in the public market.

160.    In the alternative, AE committed wrongful conduct by intentionally and willfully representing to Plaintiffs, the Broker and/or Transfer Agent that Plaintiffs' Shares were not validly-issued and authorized, in order to induce the Broker and/or Transfer Agent's to not sell Plaintiffs' Shares, when, in fact, AE was aware that it had no legitimate basis to allege that the shares issued to Plaintiffs were not validly authorized.

161.    In reliance upon AE's intentionally or recklessly false statements of material fact and/or intentional or reckless omissions of material facts, Plaintiffs have been unable to sell their

shares in the public markets during a time when AE's common stock has dropped approximately 30%.

162.    As a direct result and proximate result of AEs' wrongful conduct, Plaintiffs suffered damages in connection with its purchase and/or receipt of the Shares.

163.    As result of the foregoing, Plaintiffs seek damages in an amount to be determined at trial.

## COUNT II

### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder against Masur And O'Hara)

164.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

165.    By engaging in the acts and conduct described herein, Masur and O'Hara directly or indirectly, singly or in concert, by use of the means or instrumentalities of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase and sale of securities, have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and/or (iii) engaged in acts, practices and a course of business that operated as a fraud and deceit upon Plaintiffs as purchaser of the Shares.

166.    Masur and O'Hara committed wrongful conduct by intentionally and willfully representing to Plaintiffs, the Broker and/or Transfer Agent that Plaintiffs' Shares were not validly issued and authorized in order to induce the Broker and/or Transfer Agent's to not sell Plaintiffs' Shares, when, in fact, Masur and O'Hara were aware that AE had no legitimate basis to allege that the shares issued to Plaintiffs were not validly authorized.

167.    In reliance upon Masur and O'Hara's publication of intentionally or recklessly false statements of material fact and/or intentional or reckless omissions of material facts, Plaintiffs have been unable to sell their shares in the public markets during a time when AE's common stock has dropped approximately 30%.

168.    As a direct result and proximate result of Masur and O'Hara's wrongful conduct, Plaintiffs suffered damages in connection with its purchase and/or receipt of the Shares.

169.    As result of the foregoing, Plaintiffs seek damages in an amount to be determined at trial.

### COUNT III

**(Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Thereunder against ECG And Pugh)**

170.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

171.    By engaging in the acts and conduct described herein, ECG and Pugh directly or indirectly, singly or in concert, by use of the means or instrumentalities of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase and sale of securities, has: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and/or (iii) engaged in acts, practices and a course of business that operated as a fraud and deceit upon Plaintiffs as purchaser of the Shares.

172.    ECG and Pugh committed wrongful conduct by intentionally and willfully, directly or indirectly, causing the Demand Letter to be published to Broker and Transfer Agent, in order to induce the Broker and/or Transfer Agent's to not sell Plaintiffs' Shares, when, in fact, ECG and

Pugh were aware that AE had no legitimate basis to allege that the shares issued to Plaintiffs were not validly authorized.

173.     In reliance upon ECG and Pugh's intentional actions resulting in the publication of intentionally or recklessly false statements of material fact and/or intentional or reckless omissions of material facts, Plaintiffs have been unable to sell their shares in the public markets during a time when AE's common stock has dropped approximately 30%.

174.     As a direct result and proximate result of ECG and Pugh's wrongful conduct, Plaintiffs suffered damages in connection with its purchase and/or receipt of the Shares.

175.     As result of the foregoing, Plaintiffs seek damages in an amount to be determined at trial.

## COUNT IV

### (Violation of Section 20(a) of the Exchange Act
### Against Quarles, Adamczyk, Barcklow and Schultz)

176.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

177.     During all relevant times, Quarles, Adamczyk, Barcklow and Schultz, as directors of AE, have acted as controlling persons of AE within the meaning of Section 20(a) of the Exchange Act as alleged herein.

178.     Quarles, Adamczyk, Barcklow and Schultz had direct and supervisory control over AE, including its decision to repeatedly represent in AE's public filings that the Shares issued to Plaintiffs were authorized and validly issued.  Indeed, Quarles, Adamczyk, Barcklow and/or Schultz have all signed one or more Form 10-Ks and Form 10-Qs and/or the S-1 that represented the Shares issued to Plaintiffs were validly issued.

179.     Quarles, Adamczyk, Barcklow and Schultz had direct and supervisory control over

AE, including its decision to email the Broker and Transfer Agent the Demand Letter, which they knew contained false and misleading statements of fact and material omissions.

180.    Quarles, Adamczyk, Barcklow and/or Schultz culpably participated in the commission of the wrongs alleged herein.

181.    As alleged in Count I, AE violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

182.    By virtue of Quarles, Adamczyk, Barcklow and/or Schultz being control persons over the AE, they are each liable pursuant to Section 20(a) of the Exchange Act.

183.    As a direct and proximate result of Quarles, Adamczyk, Barcklow and/or Schultz's wrongful conduct, Plaintiffs suffered damages in connection with their receipt of the Shares.

## COUNT V

### (Violation of Section 20(a) of the Exchange Act
### Against Baer)

184.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

185.    Upon information and belief, Baer, is a consultant to AE's board of directors and a large shareholder of AE, and as such, AE's board has given Baer substantial control over AE's legal affairs, including, directing ECG and Pugh to assert the false statements of fact in the Demand Letter and directing the publication of the Demand Letter.[6]

186.    During all relevant times, Baer acted as a control person of AE within the meaning

---

[6] See AE's Form 8-K, dated November 16, 2018, identifying Baer is a consultant to AE's board of directors.  Publicly reported cases state that Baer was a partner in a California law firm despite being a non-lawyer.  *See Southern California Sunbelt Developers, Inc. v. Banyan Limited Partnership*, 8 Cal.App.5th 910, 917 (Jan., 19, 2017),).  *See also Baer v. Tedder*, 2018 WL 1080582 (Cal. Ct. App. 4th Div.) (Feb. 28, 2018); and *Banyan Ltd. P'ship et. Al. v. Baer*, 2016 WL 4382635 (Cal. Ct. of App., 4th Div.) (Aug., 17, 2016).   In all of the above-referenced litigations, Defendants ECG/Pugh represented Defendant Baer and his related entities.

of Section 20(a) of the Exchange Act as alleged herein.

187.   Upon information and belief, despite not having a fiduciary duty to AE or its shareholders, Baer has direct and supervisory control over AE, including its decision to direct ECG/Pugh to draft the Demand Letter and direct Masur/O'Hara to publish the Demand Letter.

188.   Baer culpably and actively participated in the commission of the wrongs alleged herein.

189.   As alleged in Count I, AE violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

190.   By virtue of Baer being a control person over the AE, he is liable pursuant to Section 20(a) of the Exchange Act.

191.   As a direct and proximate result of Baer's wrongful conduct, Plaintiffs suffered damages in connection with their receipt of the Shares.

## COUNT VI

**(Tortious Interference With Prospective Business Relations Against AE, Quarles, Adamczyk, Barcklow, Schultz and Baer, Masur, O'Hara, ECG and Pugh)**

192.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

193.   Plaintiffs entered into business relations with Broker whereby it agreed that it would sell Plaintiffs' Shares into the public market.

194.   AE interfered with Plaintiffs' business relationship with Broker by directing O'Hara to email the Demand Letter to the Broker with malice and/or using wrongful means because AE was aware that the Demand Letter asserted false and misleading statements about Plaintiffs.  AE hoped and intended that the Broker would refuse to sell the Shares upon review of the Demand Letter.

195.    Quarles, Adamczyk, Barcklow, Schultz and Baer as directors and/or consultants of AE with malice and aware that the Demand Letter contained false and misleading statements about Plaintiffs instructed AE's legal counsel to prepare the Demand Letter and publish said letter to the Broker with the intent that the Broker would refuse to sell the Shares upon review of the Demand Letter.

196.    Masur and O'Hara as counsel for AE with malice and aware that the Demand Letter contained false and misleading statements about Plaintiffs emailed the Demand Letter to the Broker with the intent that the Broker would refuse to sell the Shares upon review of the Demand Letter.

197.    ECG and Pugh as counsel for AE with malice and awareness that the Demand Letter contained false and misleading statements about Plaintiffs directed Masur/ECG to email the Demand Letter to the Broker with the intent that the Broker would refuse to sell the Shares upon review of the Demand Letter.

198.    As a result of aforementioned wrongful conduct, the Broker refused to continue selling Plaintiffs' Shares.  Plaintiffs were actually and wrongfully prevented from continuing their business relationship with Broker as a result of Defendants' wrongful conduct.

199.    As a proximate cause of the wrongful conduct, Plaintiffs' business relationship with Broker has been injured and Plaintiffs are unable to sell their shares in the open market, and has been injured in an amount to be determined at trial, but believed to be not less than $350,000.

200.    As a result of Defendants' willful and wanton conduct that was in reckless disregard for Plaintiffs' rights, which showed a high degree of moral turpitude, Plaintiffs are entitled to punitive damages in an amount to be determined at trial.

201.    As a result of the foregoing, Defendants are jointly and severally liable to Plaintiffs

in an amount to be determined at trial.

**COUNT VII**

**(Libel Per Se Against AE, Quarles, Adamczyk, Barcklow, Schultz, Baer, Masur, O'Hara, ECG and Pugh)**

202.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

203.   The Demand Letter was published by Masur/O'Hara on the instruction of ECG and Pugh, who likewise were instructed to publish the Demand Letter by AE and its directors, Quarles, Adamczyk, Barcklow, Schultz and its legal consultant, Baer.

204.   The Demand Letter contains false statements of fact that injure Plaintiffs in their business, trade and profession as lawyers by alleging falsely that Plaintiffs breached their fiduciary duty to clients, violated professional rules of responsibility and engaged in a conspiracy with Farley.

205.   AE, Quarles, Adamczyk, Barcklow, Schultz, Masur, O'Hara, ECG and Pugh caused the publication of the Demand Letter to the Broker and Transfer Agent despite knowing when it was published that it contained false and defamatory statements of fact concerning Plaintiffs.

206.   As a result of the publication of the Demand Letter, the Broker refused to sell Plaintiffs' shares, which has caused injury to Plaintiffs in an amount to be determined at trial.

207.   Defendants published the false statements of fact in the Demand Letter with malice towards Plaintiffs.

208.   The Demand Letter contains statements that are libelous per se because they defame Plaintiffs in their profession.

209.   Defendants' conduct in publishing the false statements in the Demand Letter were

made with great moral turpitude and wanton disregard of the truth.

210.    As a result of Defendants' libel, Plaintiffs are entitled to recover compensatory and punitive damages.

## COUNT VIII

### (Declaratory Judgment Against AE, Pursuant to Rule 57 of Fed.R.Civ.P and 28 U.S.C. § 2201)

211.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

212.    There exists a substantial controversy between Plaintiffs and AE concerning whether the Shares issued to Plaintiffs are rescindable as alleged in AE's Demand Letter.

213.    Plaintiffs and AE have adverse legal interests of sufficient immediacy and reality that warrants the issuance of a declaratory judgment.

214.    A declaratory judgment would (i) serve a useful purpose in settling the legal issue of whether Plaintiffs' shares are rescindable as asserted by AE and (ii) offer Plaintiffs relief from uncertainty concerning whether or not it has the right to sell the Shares in the public market.

215.    Plaintiffs seek a declaratory judgment that determines Plaintiffs as the rightful owners of the 1,242,711 shares of AE common stock that AE issued to Plaintiffs no later than March 2018.

216.    Plaintiffs respectfully request that the Court order a speedy hearing of this declaratory judgment claim.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment as follows:

a.   On Count I, an award of compensatory and statutory damages in favor of Plaintiffs against AE for all damages sustained as a result of its wrongdoing in an amount to be proven at trial, but believed to exceed $350,000, punitive damages, interest, attorneys'

fees, costs of suit and such other and further relief as this Court deems just and proper;

b. On Count II, an award of compensatory and statutory damages in favor of Plaintiffs against Masur and O'Hara for all damages sustained as a result of its wrongdoing in an amount to be proven at trial, but believed to exceed $350,000, punitive damages, interest, attorneys' fees, costs of suit and such other and further relief as this Court deems just and proper;

c. On Count III, an award of compensatory and statutory damages in favor of Plaintiffs against ECG and Pugh for all damages sustained as a result of its wrongdoing in an amount to be proven at trial, but believed to exceed $350,000, punitive damages, interest, attorneys' fees, costs of suit and such other and further relief as this Court deems just and proper;

d. On Count IV and V, an award of compensatory and statutory damages in favor of Plaintiffs against Quarles, Adamczyk, Barcklow, Schultz and Baer jointly and severally, for all damages sustained as a result of their wrongdoing, in an amount to be proven at trial, but believed to exceed $350,000, punitive damages, interest, attorneys' fees, costs of suit and such other and further relief as this Court deems just and proper;

e. On Count VI, an award of compensatory and statutory damages in favor of Plaintiffs against Quarles, Adamczyk, Barcklow, Schultz, Baer, Masur, O'Hara, ECG and Pugh jointly and severally, for all damages sustained as a result of their wrongdoing, in an amount to be proven at trial, but believed to exceed $350,000, punitive damages, interest, attorneys' fees, costs of suit and such other and further relief as this Court deems just and proper;

f. On Count VII, an award of compensatory and statutory damages in favor of Plaintiffs against Quarles, Adamczyk, Barcklow, Schultz, Baer, Masur, O'Hara, ECG and Pugh jointly and severally, for all damages sustained as a result of their wrongdoing, in an amount to be proven at trial, but believed to exceed $350,000, punitive damages, interest, attorneys' fees, costs of suit and such other and further relief as this Court deems just and proper;

g. On County VIII, an award of Plaintiffs' a declaratory judgment that they are the rightful owners of 1,242,711 shares of AE common stock previously issued to Plaintiffs; and

h. An award of other and further relief as the Court finds just and equitable.

Dated: July 3, 2019                                    Respectfully submitted,

                                                       *Counsel for Plaintiffs*

                                                       **GUSRAE KAPLAN NUSBAUM**

By:      /s/ Ryan J. Whalen_____

          Ryan J. Whalen, Esq.
          120 Wall Street
          New York, NY 10005
          Tel.:    (212) 269-1400
          Fax:    (212) 809-5449
          Email: mkaplan@gusraekaplan.com
          Email: rwhalen@gusraekaplan.com